**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ANDRITZ INC.,                                  :
                                               :
     Plaintiff,                     :
                                               :
v.                                             :     CIVIL ACTION NO.
                                               :     1:15-CV-00796-RWS
M&G FINANZIARIA S.R.L.,                         :
BIOCHEMTEX S.P.A.,                              :
CHEMTEX ITALIA S.R.L,                           :
CHEMTEX INTERNATIONAL,                          :
INC., CAROLINA CELLULOSIC                       :
BIOFUELS, LLC, BETA                             :
RENEWABLES S.P.A., and                         :
BETA RENEWABLES USA,                            :
INC.,                                          :
                                               :
     Defendants.                    :

## <u>ORDER</u>

Plaintiff Andritz Inc. ("Andritz"), a Georgia corporation, brought this

action against Defendants M&G Finanziaria S.r.l. ("M&G"), an Italian

corporation; Chemtex Italia S.r.l. ("Chemtex Italia") an Italian corporation;

Biochemtex S.p.A. ("Biochemtex"), an Italian corporation; Chemtex

International, Inc. ("Chemtex International"), a Delaware corporation with its

principal place of business in North Carolina; Carolina Cellulosic Biofuels,

LLC ("Carolina Cellulosic"), a Delaware limited-liability corporation with its

principal place of business in North Carolina; Beta Renewables S.p.A. ("Beta Renewables"), an Italian joint venture; and Beta Renewables USA, Inc. ("Beta Renewables USA"), a Delaware corporation with its principal place of business in North Carolina.  Plaintiff refers to all defendants in the Complaint collectively as "Defendants" or "Chemtex."  (Compl., Dkt. [1] at 1.)  In essence, Plaintiff alleges that Defendants have misappropriated and stolen Andritz's proprietary system and technology for producing biomass into cellulosic ethanol.

This case comes before the Court on Defendants' Motion to Dismiss [11] and Plaintiff's Motion to Supplement the Record in Opposition of Defendants' Motion to Dismiss [33].  As an initial matter, the Motion to Supplement the Record [33] is **GRANTED**.

The Court now turns to Defendants' Motion to Dismiss.  On March 7, 2016, the Court heard oral arguments on that Motion.  Based on the parties' arguments at that hearing and a review of the record, the Court enters the following Order.

2

## Background[1]

This case arises out of a complex contractual relationship among Plaintiff, its parent company and related entities, and Defendants.  All entities involved in this case provide equipment and/or services in the biofuels market. (Compl., Dkt. [1] ¶¶ 1-2.)  Specifically, the product or service underlying this case is an "innovative pre-treatment system for production of biomass into... cellulosic ethanol, a 'second generation' biofuel which is often referred to as the 'holy grail' of biofuel."  (Id. ¶ 1.)  As a result of the system it has developed, Andritz enjoys a "significant competitive advantage" in the fast-growing second-generation biofuel market.  (Id.)  Additionally, Andritz's pre-treatment system can be used to convert biomass into other chemicals and bioproducts, and therefore will have profitable applications in other industries. (Id.)

Defendants provide equipment and services in the biofuels market. Andritz alleges that Defendants are related entities under common control and are either wholly owned by M&G or are directly or indirectly controlled by

---

[1]  As the case is before the Court on a Motion to Dismiss, the Court accepts as true the facts alleged in the complaint.  Cooper v. Pate, 378 U.S. 546, 546 (1964).

M&G.  (Id. ¶¶ 2, 13.)

At the core of the Complaint is Andritz's allegation that Defendants have, through breach of a non-disclosure agreement (the "NDA"), stolen Andritz's proprietary system and technology.  (Id. ¶ 2.)  Plaintiff also alleges that Defendants misappropriated Andritz's trade secrets and unlawfully marketed and sold Andritz's system as their own.  (Id.)

## I.     Andritz's Biofuel Production Process

Andritz supplies plants, equipment, and services for a variety of industrial applications, including–with particular relevance to this action– "technology and services for the production of second-generation liquid biofuels like cellulosic ethanol, which is made from non-food agricultural sources and forest waste."  (Id. ¶¶ 18-19.)  Because the science behind this process is not particularly relevant to the jurisdictional matters currently before the Court, the Court saves recitation of those facts for another time.  For the purposes of this motion, it is enough to note that Andritz has developed a more efficient pre-treatment system such that the costs of turning less expensive and non-food raw materials into fuel have become economically practical on a commercial scale.  (Id. ¶¶ 21-24.)  Additionally, Plaintiff characterizes the

4

production of second-generation biofuels as an "ultra-competitive industry" with "high commercial stakes and potential economic returns"–an industry estimated to be a $23.9 billion market by 2020.  (Id. ¶ 25.)  All this is to say, Andritz's "unique and superior" process has the potential to add enormous value to any player in the second-generation biofuels market.  (Id. ¶¶ 28-29.) Taking steps to protect this technology, Andritz filed a provisional U.S. patent application in 2008, which was granted in 2011.  (Id. ¶ 30.)  In addition to Andritz's patented technology, Andritz developed "proprietary equipment, documentation, and technical information and know-how to implement and optimize its pre-treatment system."  (Id. ¶ 33.)

## II.   The Non-Disclosure Agreement and the Rivalta Plant

Andritz began its dealings with Defendants in 2008.  From 2006 to 2008, Defendants "scouted" for technology to develop a pre-treatment process for second-generation biofuels.  (Id. ¶ 34.)  In March 2008, Chemtex and Andritz began discussions regarding Andritz's pre-treatment system and technology. (Id. ¶ 35.)  On April 4, 2008, Andritz engineers Thomas Pschorn and Bertil Stromberg met with Chemtex's representative Dario Giordano in Cleveland, Ohio.  (Id.)  Andritz refused to discuss its system and technology in detail until

5

Chemtex executed a non-disclosure agreement, which both parties did on or about April 8, 2008.  (Id. ¶ 36; the "NDA," Ex. A to Compl., Dkt. [1-1].)  That same day, Pschorn and other Andritz engineers Loic Lubeque, Peter Mraz, and Christian Radhuber met with Chemtex representatives in Rivalta, Italy. (Compl., Dkt. [1] ¶ 36.)

The NDA was executed by a representative of M&G Finanziaria S.r.l in M&G's own name and "in the name and on behalf of the companies directly or indirectly controlled by it."  (Ex. A to Compl., Dkt. [1-1] at 2.)  The stated "Purpose" is that Chemtex "desires to discuss with Andritz the possibility of purchasing from Andritz a system for the pre-treatment of cellulosic feedstock for conversion of biomass to ethanol."  (Id.)  The NDA obliged both parties to "maintain in confidence all Confidential Information disclosed to it by the other" and "exercise the same degree of care to prevent disclosure of such Confidential Information to any third party as it would use for its similar information."  (Id.)  It also restricts the use of Confidential Information to the use granted under the terms of the NDA.  (Compl., Dkt. [1] ¶ 38.)  The NDA imposes its obligations "with respect to any Confidential Information that constitutes a trade secret under applicable law, for so long as such item shall

6

continue to constitute a trade secret under applicable law" and "with respect to any Confidential Information that does not constitute a trade secret under applicable law, for a period of two (2) years" from the Agreement's effective date of April 8, 2008.  (Ex. A to Compl., Dkt. [1-1] ¶ 5.)  The parties also agreed that, upon "the conclusion or completion of the Purpose or anytime upon notice from the Discloser, the Recipient shall (a) return to the Discloser all Confidential Information received under this Agreement and shall retain no duplicates or copies thereof, (b) destroy all notes and memoranda made by the Recipient that contain Confidential information, and (c) certify to the Discloser in writing that the Recipient has fully complied with the obligations."  (Id. ¶ 6.)

Andritz alleges that at the time of its first meeting with Chemtex, Chemtex had no effective or commercially viable pre-treatment system of its own.  Rather, Chemtex was meeting with other companies to evaluate potential pre-treatment processes.  (Compl., Dkt. [1] ¶ 41.)  At the parties' first meeting, Andritz described the pre-treatment system that was the basis of Andritz's February 28, 2008 patent application (the "now-patented system").  (Id. ¶ 42.)  At that time–early April 2008–the now-patented system was not known by or available to the public.  (Id.)

7

Chemtex began negotiating with Andritz for the design and construction of a pilot pre-treatment plant in Rivalta, Italy.  (Id. ¶ 43.)  As part of a subsequent agreement, on July 26, 2008, Andritz sent Chemtex a technical proposal for such a plant (the "Pilot Plant Technical Proposal").  (Id.)  In the Pilot Plant Technical Proposal, Andritz describes its "proprietary" now-patented system and provided–in addition to the information in the provisional patent application–detailed proprietary information, including "in-depth technical, equipment, and engineering specifications, system design data, system utility demands, technical specifications, equipment drawings, and service specifications."  (Id. ¶ 45.)  Andritz thereafter supplied Chemtex with more technical and engineering documents, which contained "trade secrets and other confidential and proprietary information and know-how, such as site layouts, dimension drawings, machine and equipment connection data and technical requirements, process manuals, operating manuals, training materials, and maintenance instructions."  (Id. ¶ 46.)  Andritz alleges that this information, which it refers to in its Complaint as the "Rivalta Trade Secrets," was confidential information under the NDA and that the Proposal and other documents were trade secrets.  (Id. ¶¶ 47-48.)

Andritz alleges that the Rivalta Trade Secrets were created with "substantial effort and at significant expense" and are economically valuable to Andritz, as they would be to any competitor.  (Id. ¶¶ 49-50.)  Andritz alleges that the particular value of the Rivalta Trade Secrets to competitors is that they would "provide development, engineering, construction, and service plans for second-generation pre-treatment plants, processes, and equipment without incurring ... significant development and engineering costs."  (Id. ¶ 51.)

Because of the Rivalta Trade Secrets' value, Andritz has implemented several mechanisms to protect this information.  The Rivalta Trade Secrets are housed in "various electronic databases contained on a secure data network in Vienna, Austria, which requires use of a user identification and password to access."  (Id. ¶ 53.)  Access is limited to certain employees who "have a legitimate need to access the information stored in the particular folder or database."  (Id.)  Hard copies of drawings, blueprints, specifications, and other documents are labeled as containing confidential and proprietary information and are stored in private, secure, access-controlled facilities in Vienna, Austria.  (Id. ¶ 54.)  Andritz further requires employees, contractors, and entities that are permitted to access confidential and proprietary information to enter into non-

9

disclosure agreements.  (Id. ¶ 55.)

Between April and June 2009, Andritz built a pre-treatment plant at Rivalta, Italy (the "Rivalta plant"), which began operating in September 2009. (Id. ¶ 60.)  Andritz provided equipment for the plant that is specifically designed to run only Andritz's proprietary pre-treatment system.  (Id. ¶ 61.) The Rivalta plant "has been a huge success."  (Id. ¶ 64.)

## III.   Subsequent Agreements and the Crescentino Plant

Also in September 2009, Andritz and Chemtex began discussions regarding a "broader business relationship to provide second-generation biofuels throughout the world.  (Id. ¶ 65.)  Specifically, the parties discussed constructing a commercial-scale pre-treatment plant in Crescentino, Italy, to "demonstrate the feasibility and profitability of second-generation cellulosic ethanol;" Andritz's CEO Wolfgang Leitner met with Chemtex and Beta Renewables' CEO Guido Ghisolfi on June 8, 2010.  (Id. ¶ 66.)  While Chemtex initially suggested a facility with an output capacity of 70 to 80 tons per day, Andritz advocated for a larger facility.  (Id.)

On June 23, 2010, Chemtex proposed an exclusive relationship wherein Chemtex would have exclusive world-wide control over Andritz's pre-

AO 72A
(Rev.8/82)

treatment system and technology.  (Id. ¶ 67.)  Andritz ultimately rejected this proposal, because it had pre-existing relationships with other commercial partners and because it "wanted the freedom to sell its pre-treatment system and technology to other companies in order to take advantage of anticipated global demand."  (Id. ¶ 68.)

On August 27, 2010, Chemtex sent Andritz a proposal to extend the NDA.  (Id. ¶ 69.)  The parties executed the agreement (the "NDA extension") in September 2010.  (Id.)

On September 21, 2010, after executing the NDA extension, Andritz sent Chemtex a proposal for an "Advanced SteamEx Pre-Treatment System" at a facility in Crescentino, Italy (the "Crescentino Plant Technical Proposal").  (Id. ¶ 70.)  The Crescentino Plant Technical Proposal provided "detailed and proprietary technical and engineering specifications" for the "world's first commercial-scale pre-treatment plant."  (Id. ¶¶ 71-72.)  This blueprint was based on Andritz's pre-treatment process, equipment, and other proprietary information.  (Id. ¶ 71.)  Andritz later provided even more technical and engineering documents that it alleges "contained trade secrets and other confidential and proprietary information, such as site layouts, dimension

11

drawings, machine and equipment connection data and technical requirements,

training materials, and maintenance instructions."  (Id. ¶ 74.)

Beginning in March 2012, Andritz delivered equipment and use

materials, including assembly manuals, operating manuals, process manuals,

and other documents relating to the Crescentino Plant.  (Id. ¶ 76.)  These

"assembly and use materials" explained how to optimize Andritz's pre-

treatment system for the commercial volume of biomass contemplated.  (Id.)

Like the equipment at the Rivalta Plant, the Crescentino Plant's equipment is

designed specifically only to run Andritz's proprietary pre-treatment system.

(Id. ¶ 77.)  Andritz alleges that the equipment, assembly and use materials, the

Crescentino Plant Technical Proposal, and other technical and engineering

documents provided to Chemtex (collectively, the "Crescentino Trade Secrets")

are confidential information and trade secrets.  (Id. ¶¶ 78-80.)  Andritz further

alleges that the Crescentino Trade Secrets are economically valuable to

Andritz, as they would be to any competitor.  (Id. ¶ 80.)

As with the Rivalta Trade Secrets, because of the Crescentino Trade

Secrets' value, Andritz has implemented several mechanisms to protect this

information.  The Crescentino Trade Secrets are housed in "various electronic

AO 72A
(Rev.8/82)

databases contained on a secure data network in Vienna, Austria; Glens Falls, New York; and Atlanta, Georgia, which requires use of a user identification and password to access." (Id. ¶ 82.) Access is limited to certain employees who "have a legitimate need to access the information stored in the particular folder or database." (Id.) Hard copies of drawings, blueprints, specifications, and other documents are labeled as containing confidential and proprietary information and are stored in private, secure, access-controlled facilities in Vienna, Austria; Glens Falls, New York; and Atlanta, Georgia. (Id. ¶ 83.) Andritz further requires employees, contractors, and entities that are permitted to access confidential and proprietary information to enter into non-disclosure agreements. (Id. ¶ 85.) Andritz alleges that it has "heavily guarded the secrecy of its pre-treatment equipment for both the Rivalta plant and the Crescentino plant," refusing to provide Chemtex with fabrication drawings of the equipment. (Id. ¶ 84.)

## III. Defendants' Second-Generation Ethanol Plants

Later in 2012, Andritz learned that Defendants were planning to build second-generation cellulosic ethanol plants in Columbia, Brazil, and North Carolina. (Id. ¶ 87.)

A.     The Brazil Project

In August 2012, Andritz learned that it would not provide the pre-treatment system for Chemtex's project in Brazil (the "GraalBio project").  (Id. ¶ 88.)  Andritz's Mr. Stromberg sent Chemtex's Mr. Giordano an email inquiring after the project and asking for written assurances that Chemtex had not breached the NDA.  (Id.)  Mr. Giordano replied on September 13, 2012, and wrote that Chemtex has "always complied" with the NDA and that he had "no evidence or even reason to believe that the GraalBio project has involved the disclosure of any confidential information of Andritz."  (Id. ¶ 89.)

Andritz alleges that Chemtex has removed the Andritz branding from the equipment at the Crescentino plant and represents to its potential customers that the pre-treatment equipment could be built anywhere in the world.  (Id. ¶ 90.)  Andritz further alleges that Chemtex refused an offer to sell its filter presses in connection with the GraalBio project, because to purchase equipment from Andritz "would have given Andritz access to the construction site and allowed Andritz to learn of Chemtex's misappropriation of Andritz's trade secrets and confidential information."  (Id. ¶ 93.)

On April 4, 2013, Andritz asked Chemtex to extend the NDA; Chemtex

14

refused.  (Id. ¶ 94.)  Four days later, Andritz sent formal notice to Chemtex pursuant to the NDA, requesting return of all Confidential Information disclosed by Andritz, the destruction of all notes and memoranda made by Chemtex containing Confidential Information, and written certification of Chemtex's compliance with the NDA.  (Id. ¶ 95.)  Chemtex verbally replied that it had no Confidential Information to return.  (Id. ¶ 96.)

In June 2013, Chemtex represented that the GraalBio project had the same footprint as the Crescentino plant.  (Id. ¶ 97.)  In January 2014, aerial photos of the plant in Brazil showed that the "layout and equipment appeared to match the design of the Crescentino plant."  (Id. ¶ 98.)

B.      The North Carolina Project

Around the same time, Defendants advertised that another project in North Carolina, Project Alpha, was based on the project in Brazil.  (Id. ¶ 99.) On January 27, 2014, Andritz filed a Freedom of Information Act request with the United States Department of Agriculture seeking information about Project Alpha.  (Id.)  Andritz received a heavily redacted response in November 2014. (Id. ¶ 100.)  Andritz alleges that this response "revealed that Chemtex had breached the NDA and misappropriated [Andritz's] trade secrets in connection

15

with the North Carolina facility." (Id.)  Specifically, the FOIA response

indicates that in April 2012, Chemtex submitted technical information

regarding construction of and the process for a commercial-scale second-

generation ethanol facility.  (Id. ¶ 101.)  Andritz did not know or approve of

those submissions.  (Id.)  Chemtex's submissions to the FDA referred to a

"demonstration plant ... in Northern Italy" that Andritz alleges is the

Crescentino Plant, which was to be constructed using Andritz's proprietary pre-

treatment system that was the subject of the NDA.  (Id. ¶¶ 102-03.)  In April

2012, however, the Crescentino Plant had not yet been built: accordingly, the

only information and materials Chemtex had at that time were the Crescentino

Trade Secrets.  (Id. ¶ 104.)  Andritz alleges that the FOIA response therefore

reveals that "Defendants were using the Crescentino Trade Secrets for Project

Alpha and also to facilitate their worldwide expansion."  (Id. ¶ 105.)

        In support of this allegation, Andritz gives examples of where

Defendants "used Andritz's trade secrets and engaged in unfair, deceptive, and

false advertising to surreptitiously gain market share."  (Id. ¶ 108.)  For

instance, Andritz alleges that the Project Alpha submission contained the

following false and/or deceptive representations:

- Chemtex "developed" its "game changing" pre-treatment technology;

- Chemtex owns this pre-treatment technology and that the process is "proprietary" and "unique" to Chemtex because "it offers significant capital and operating cost benefits compared with other second generation technologies in the marketplace;"

- Chemtex developed a "unique bio-mass pre-treatment and hydrolysis process for transforming cellulosic feedstocks into sugar for conversion into ethanol and/or bio-based chemicals," which "provides a cost competitive way to supply inexpensive sugars not only to the ethanol industry but to the specialty chemical industry;"

- and Chemtex developed this process "at the company's continuous pilot plant facility in Rivalta, Italy."

(Id. ¶ 109.)  Based on the bidding paperwork released by the USDA, Andritz believes that Chemtex's communications with "large landowners and local farmers within the proposed project area to ensure local buy[-]in of Project Alpha" also involved similar "misrepresentations."  (Id. ¶ 110.)

C.   Other Projects in the United States and Abroad

Andritz alleges that Defendants' other projects in California, China, Columbia, Brazil, Italy, Malaysia, the Slovak Republic, and India also involve use and/or disclosure of confidential information covered by the NDA and false and/or deceptive advertising.  (Id. ¶¶ 111-12.)

17

Andritz alleges that these disclosures occurred in connection with Chemtex's bid to design and build a second-generation cellulosic ethanol facility for Canergy, a California company.  (Id. ¶ 114.)

Chemtex and Texas Pacific Group formed a joint venture called Beta Renewables.  (Id. ¶ 119.)  Beta Renewables licenses "all the technology related to second-generation ethanol production–from initial biomass handling, through pre-treatment, and also the fermentation and distillation of the extracted sugar into ethanol" from Chemtex, while Chemtex provides engineering and construction services.  (Id.)  Chemtex and Beta Renewables also market "PROESA,"[2] a "pre-treatment phase" where "smart cooking of the biomass minimizes the formation of inhibitors and increases overall efficiency."  (Id. ¶¶ 116-17.)

Andritz alleges that Beta Renewables misrepresents that it–and not Andritz–developed the pre-treatment technology used in the Crescentino facility.  Beta Renewables's press kit states:

> Beta Renewables has invested over $200 million (€150 million) in the development of the Proesa™ process.  The

_____

[2]  This name is derived from the Italian translation of "ethanol production from biomass," or "**PRO**duzione di **E**tanolo da biomas**sA**."  (Id. ¶ 116.)

company designed and built the world's first commercial-scale cellulosic ethanol facility in Crescentino, Italy, that started operations at the beginning of 2013.

(Id. ¶ 121.)  Additionally, Proesa and Crescentino brochures have similar

"misrepresentations":

- "The challenge was taken up and the problem overcome by a group of researchers at Biochemtex, ... who developed Proesa™ on the basis of research carried out in the lab;"

- "Proesa™ was developed by a group of researchers working at Biochemtex, based in Rivalta Scrivia (AL);"

- "The plant is based entirely on the Proesa™ technology developed by Biochemtex, which also built the facility;"

- "[T]ransform[ing] laboratory results into production on an effectively industrial scale ... has been made possible thanks to Proesa™ technology, developed in the laboratories of Biochemtex, a Mossi Ghisolfi Group company.  The expertise developed at Crescentino will enable similar plants to be built in the USA, Latin America, Europe, and Asia;" and

- "The Proesa™ project and construction of the Crescentino bio-refinery were carried out by Mossi Ghisolfi Group companies... Biochemtex developed the technology and designed and built the plant."

(Id. ¶ 122.)  Andritz alleges that these representations will cause Andritz to lose

out on potential market share and, moreoever, that Biochemtex's continued

dealings with potential customers presents a risk that Andritz's proprietary

information will be more widely disseminated.  (Id. ¶¶ 124-26.)

## IV.    Chemtex's Patent Applications

Andritz further alleges that Chemtex committed additional use and

disclosure violations through a series of patent applications.  Chemtex filed

patent application WO 2010/113129 with the World Intellectual Property

Organization for a pre-treatment process that Andritz alleges is "the pre-

treatment process disclosed by Andritz in the Pilot Plant Technical Proposal

and meetings following execution of the NDA."  (Id. ¶¶ 128-129.)  Chemtex

filed the application for the "3129 Patent" on March 31, 2009, before the

delivery and installation of the pilot pre-treatment plant at Rivalta.  (Id. ¶ 128.)

Andritz neither knew of nor consented to this application, which it alleges

described "a key component of Andritz's proprietary pre-treatment system,

which was not publicly known at the time of this submission."  (Id. ¶ 130.)

Chemtex filed for two more pre-treatment patents with the World

Intellectual Property Organization.  The first, WO 2012/042544, outlines pre-

treatment combinations for different biomass stocks that Andritz alleges were

"determined using Andritz's system and technology at the pilot plant."  (Id. ¶

132.)  The second, WO 2012/042497, "purports to build on Andritz's now-patented pre-treatment process by separating the pre-extraction streams."  (Id. ¶ 133.)  Andritz alleges that this separation process "was precisely the design proposed and used by Andritz for the pilot plant at Rivalta."  (Id.)

## V.     The Complaint

Relying on the above allegations, Andritz filed this Complaint [1] on March 17, 2015.  The Complaint enumerates seven causes of action: Breach of Confidentiality Agreement (Count I); Misappropriation of Trade Secrets (Count II); Unjust Enrichment (Count III); Fraud (Count IV); False Advertising Under 15 U.S.C. § 1125(a) (Count V); Violation of the North Carolina Deceptive Trade Practices Act (Count VI); and Violation of California's Business & Professions Code §§ 17200 and 17500 (Count VII).  Plaintiff asserts that jurisdiction in this Court is proper based on the diversity of the parties, federal question, and supplemental jurisdiction for the state law claims.  (Compl., Dkt. [1] ¶ 16 (citing 28 U.S.C. §§ 1331, 1332, 1367(a)).)  Defendants now move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) for

lack of subject matter jurisdiction,[3] 12(b)(2) for lack of personal jurisdiction, and 12(b)(6) for failure to state a claim.  Plaintiff opposes this motion.

## Discussion

The Court first considers whether it has personal jurisdiction over Defendants.  Courts are to rule on jurisdictional issues before considering the merits of a complaint.  Posner v. Essex Ins. Co., 178 F.3d 1209, 1214 (11th Cir. 1999) ("[A] court should decide a 12(b)(2) motion to dismiss before a 12(b)(6) motion because 'a court without [12(b)(2)] jurisdiction lacks power to dismiss a complaint for failure to state a claim.'") (quoting Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)).  If the Court finds personal jurisdiction to be lacking, it must dismiss the suit and cannot consider the merits of Plaintiff's claims or the other motions before the Court.  See Read v. Ulmer, 308 F.2d 915, 917 (5th Cir. 1962) ("It would seem elementary that if the Court has no jurisdiction over a defendant, the defendant has an unqualified right to

---

[3]  Defendants assert in their Motion that Rule 12(b)(1) provides a basis for dismissal because Plaintiff lacks standing to bring its claim.  (Dkt. [11] at 2.)  Defendants do not, however, advance this argument in their brief and as such the Court does not address it here.  Based on the facts of the Complaint, the Court concludes that it has jurisdiction to proceed based on 28 U.S.C. § 1332 and the NDA.

AO 72A
(Rev.8/82)

have an order granting its motion to dismiss.").[4]  Accordingly, the Court first

analyzes whether it has the jurisdiction to proceed.

## VI.    Personal Jurisdiction – Rule 12(b)(2)

As recognized by the Supreme Court, personal jurisdiction comes in two

forms: general jurisdiction and specific jurisdiction.  See Goodyear Dunlop

Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011).  General

jurisdiction exists when the defendant's contacts with the forum are so

extensive that the forum state has the authority to exercise jurisdiction over the

defendant even in matters unrelated to the defendant's contacts.  Id.  Specific

jurisdiction, on the other hand, only applies in cases where the plaintiff's

claims arise from the defendant's contacts with the forum state.  Id.

### A.    General Jurisdiction

The Supreme Court recently held that "[a] court may assert general

jurisdiction over foreign (sister-state or foreign-country) corporations to hear

any and all claims against them when their affiliations with the State are so

'continuous and systematic' as to render them essentially at home in the forum

---

[4]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the court adopted as binding precedent all decisions of the former Fifth Circuit decided before October 1, 1981.

AO 72A
(Rev.8/82)

state." Goodyear, 131 S. Ct. at 2851 (2011) (citing Int'l Shoe Co. v.

Washington, 326 U.S. 310, 317 (1945)).  This is a high bar, and "mere

purchases, even if occurring at regular intervals, are not enough to warrant a

State's assertion of in personam jurisdiction over a nonresident corporation in a

cause of action not related to those purchase transactions." Helicopteros

Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 418 (1984).  In fact, in the

"textbook case of general jurisdiction appropriately exercised over a foreign

corporation," Goodyear, 131 S. Ct. at 2856 (internal quotations omitted), the

Supreme Court found that general jurisdiction existed only because the

corporation's president maintained his office and company files in the forum

state, and supervised the company from that location.  See Perkins v. Genguet

Consol. Min. Co., 342 U.S. 437, 448 (1952).

    None of the Defendants here have contacts or affiliations with the state

of Georgia strong or numerous enough for the Court to conclude that any

Defendant is "essentially at home" in Georgia.  See Goodyear, 131 S. Ct. at

2851.  Accordingly, the Court moves on to analyze whether it has "specific"

jurisdiction over any Defendant.

    B.    Specific Jurisdiction

24

For a court to exercise personal jurisdiction over a defendant, the defendant must have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe, 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  "The 'minimum contacts' required to confer personal jurisdiction over a nonresident may not be merely 'random,' 'fortuitous,' or 'attenuated.'" Home Depot Supply, Inc. v. Hunter Mgmt. LLC, 656 S.E.2d 898, 901 (Ga. Ct. App. 2008) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).  On the contrary, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privileges of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Most importantly in this case, when determining whether specific jurisdiction exists, a court must determine whether the "controversy is related to or 'arises out of' a defendant's contacts with the forum . . . ." Helicopteros, 466 U.S. at 414 (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

When a federal court sits in diversity, it properly may exercise personal jurisdiction over a defendant "only if two requirements are met: (1) the state

AO 72A
(Rev.8/82)

long-arm statute, and (2) the Due Process Clause of the Fourteenth

Amendment." Posner v. Essex Ins. Co., 178 F.3d 1209, 1214 (11th Cir. 1999).

Thus, the Court uses a "two-step inquiry in determining whether the exercise of

personal jurisdiction over a non-resident defendant is proper." Internet

Solutions Corp. v. Marshall, 557 F.3d 1293, 1295 (11th Cir. 2009). First,

courts must consider whether the exercise of personal jurisdiction of the

defendant would comport with Georgia's long-arm statute, O.C.G.A. § 9-1-91.

Id. If so, courts then consider whether the defendant has sufficient minimum

contacts with the state such that the exercise of jurisdiction would not offend

Due Process notions of "fair play and substantial justice." Id. (citation

omitted). Finally, "'[a] plaintiff seeking the exercise of personal jurisdiction

over a nonresident defendant bears the initial burden of alleging in the

complaint sufficient *facts* to make out a prima facie case of jurisdiction.'"

Scutieri v. Chambers, 386 F. App'x 951, 956 (11th Cir. 2010) (emphasis in

original) (quoting United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th

Cir. 2009)). Motions to dismiss for lack of personal jurisdiction filed at the

pleading stage should be "treated with caution" and granted only if the plaintiff

has failed to allege "sufficient facts . . . to support a reasonable inference that

26

the defendant can be subjected to jurisdiction . . . ."  Bracewell v. Nicholson

Air Servs., Inc., 680 F.2d 103, 104 (11th Cir. 1982).

C.    Analysis

The NDA contains a clause in which M&G–"in its own name and in the

name and on behalf of the companies directly or indirectly controlled by

it"–expressly submits to the jurisdiction of this court for any dispute "arising

under or in connection with" the NDA (the "jurisdiction clause").  (Ex. A to

Compl., Dkt. [1-1] ¶ 9.)  Defendants argue, however, that the NDA has no

application to this case.

As an initial matter, Defendants submit that Plaintiff has not pleaded that

any of the claims in Counts II through VII arise out of or in connection with the

NDA.  With respect to Count I, Defendants claim that the parties' agreements

subsequent to the NDA have arbitration clauses that supersede the jurisdiction

clause of the NDA.  (Defs.' Mot. to Dismiss, Dkt. [11-1] at 10.)  While

Defendants do not appear to dispute that Count I would have "arise[n] under or

in connection with" the NDA absent the later contracts, Defendants argue that,

because the NDA expressly states that it could be amended by written

agreement between the parties and because subsequent contracts that

incorporated the NDA by reference provided for international arbitration, later

contractual provisions supercede the jurisdiction clause of the initial NDA.

(Defs.' Mot. to Dismiss, Dkt. [11-1] at 6-7, 9-10.)  Defendants attach these

contracts as exhibits to their Motion to Dismiss.  (Dkt. [11-2], Dkt. [11-4].)

The NDA extension is not attached as an exhibit to the Complaint.  Nor

does the Complaint indicate which "parties" executed the extension, although

Exhibit 3 to Defendants' Motion to Dismiss references a "'Mutual

Confidentiality and Non Disclosure Agreement' dated April 8, 2008, as

amended on September 8, 2010, stipulated by Andritz Inc. and M&G

Finanziaria S.r.l."  (Ex. 3, Dkt. [11-4] at 3-4.)  Instead, the NDA extension and

the other subsequent agreements that govern the relationships among the

Andritz and Chemtex entities are attached as exhibits to Defendants' Motion to

Dismiss.

The Court may–but is not bound–to consider documents attached to

Defendants' Motion to Dismiss.  "The district court generally must convert a

motion to dismiss into a motion for summary judgment if it considers materials

outside the complaint." <u>D.L. Day v. Taylor</u>, 400 F.3d 1272, 1275-76 (11th Cir. 2005); <u>see also</u> FED. R. CIV. P. 12(d).  However, documents attached to a complaint are considered part of the complaint.  FED. R. CIV. P. 10(c).  Documents "need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, [the court] may consider such a document," provided it is central to the plaintiff's claim.  <u>D.L. Day</u>, 400 F.3d at 1276.  At the motion to dismiss phase, the Court may also consider "a document attached to a motion to dismiss . . . if the attached document is (1) central to the plaintiff's claim and (2) undisputed."  <u>Id.</u> (citing <u>Horsley v. Feldt</u>, 304 F.3d 1125, 1134 (11th Cir. 2002)).  "'Undisputed' means that the authenticity of the document is not challenged."  <u>Id.</u>  For the purposes of Defendants' Motion, the Court takes notice of those documents but does not consider them as evidence supporting Defendants' asserted defenses.

Plaintiff argues in response to Defendants' merger argument that Andritz Inc. was not a party to any of the subsequent agreements referenced by Defendants.  Rather, those contracts bind other Andritz entities–Andritz AG and Andritz KMPT GmbH.  (Pl.'s Resp. to Defs.' Mot. to Dismiss, Dkt. [21] at

29

14-15.)  Additionally, Plaintiff argues that the NDA remained in effect even as the parties and related entities entered into other agreements.  Defendant responds with the contention that Plaintiff's Complaint refers to "Andritz" when it means both Andritz Inc. and/or its parent company, Andritz AG.  (Dkt. [26] at 5.)  Defendant contends, "Plaintiff tries to gloss over its own singular treatment of these two related entities by attributing all of *Andritz AG*'s activities to 'Andritz,' which is misleadingly defined to mean Andritz Inc." (Id. at 5-6 (emphasis in original).)

In considering whether the later agreements supercede the NDA, the Court applies Georgia law.  In diversity cases, a federal court applies the law of the forum in which it sits.  LaTorre v. Conn. Mut. Life Ins. Co., 38 F.3d 538, 540 (11th Cir. 1994).  Here, the NDA provides that matters arising under the contract shall be determined in accordance with Georgia law.  (Ex. A to Compl., Dkt. [1-1] ¶ 9.)

Georgia law incorporates the "merger rule."  "The rational basis for the merger rule is that where parties enter into a final contract[,] all prior negotiations, understandings, and agreements 'on the same subject matter' are

30

merged into the final contract, and are accordingly extinguished." <u>Health Serv. Ctrs. v. Boddy</u>, 359 S.E.2d 659, 661 (Ga. Ct. App. 1987) (quoting <u>Holmes v. Worthy</u>, 282 S.E.2d 919, 923 (Ga. Ct. App. 1981)).  For the merger rule to apply, however, "the parties of the merging contracts *must be the same* and the terms of those contracts must completely cover the same subject matter and be inconsistent." <u>Atlanta Integrity Mortgage, Inc. v. Ben Hill United Methodist Church</u>, 286 Ga. App. 795, 797 (2007) (citing <u>Wallace v. Bock</u>, 279 Ga. 744, 745-46(1) (2005)) (emphasis added); <u>see also</u> <u>Noorani C-Stores v. Trico v. Petroleum</u>, 281 Ga.App. 635, 640(3) (2006) (holding that one corporation cannot rely on a merger clause in a contract entered into by another corporation)).

This case is before the Court on a motion to dismiss.  The Court must take the facts of the well-pleaded complaint as true.  <u>Cooper v. Pate</u>, 378 U.S. at 546.  Here, nothing in the Complaint indicates that Andritz Inc. and Andritz AG or Andritz KMPT GmbH are the same entity such that the merger rule would even apply.  Accordingly, the Court cannot conclude–again, based only on the facts of the Complaint–that the NDA was extinguished or superceded by any subsequent agreement *with respect to disputes between Andritz Inc. and*

31

*M&G.*

What is more, Plaintiff does not advance claims based on the later supply

agreements.  Rather, Plaintiff has chosen to draft its Complaint to bring claims

only under the NDA.  The Court finds that M&G's consent is sufficient to

confer personal jurisdiction for claims arising from the NDA.  The Georgia

long-arm statute states: "A court of this state may exercise personal jurisdiction

over any nonresident ... in the same manner as if he or she were a resident of

this state, if in person or through an agent, he or she [t]ransacts any business

within this state." O.C.G.A. § 9-1-91(1).  Personal jurisdiction exists under

subsection (1) – the "transacting business" prong of the Georgia long arm

statute – if "(1) the nonresident defendant has purposefully done some act or

consummated some transaction in [Georgia], (2) the cause of action arises from

or is connected with such act or transaction, and (3) the exercise of jurisdiction

. . . does not offend traditional fairness and substantial justice." <u>Aero Toy

Store, LLC v. Grieves</u>, 631 S.E.2d 734, 737 (Ga. Ct. App. 2006).  The Supreme

Court of Georgia has made it clear that "nothing in subsection (1) requires the

physical presence of the nonresident in Georgia or minimizes the import of a

nonresident's intangible contacts with the state." <u>Innovative Clinical &</u>

Consulting Servs., LLC v. First Nat. Bank of Ames, 620 S.E.2d 352, 355 (Ga. 2005). "The defendant, however, must 'fairly be said' to have literally 'transacted' business in Georgia." Cold Smoke Capital, LLC v. Gross, No. 1:11-CV-3558-WSD, 2012 WL 3612626, at *4 (N.D. Ga. Aug. 21, 2012) (quoting Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1264 (11th Cir. 2010)). In this case, the Court finds that Defendant M&G may fairly be said to have transacted business in the state of Georgia when it entered into the NDA with Andritz Inc., a Georgia corporation, and expressly submitted to the jurisdiction of Georgia courts.

The Court further finds that the exercise of jurisdiction over M&G based on the NDA does not violate traditional notions of fair play and substantial justice and, as such, comports with constitutional due process. See Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). This is not a case that involves a one time purchase of goods. Cf. Owen of Georgia, Inc. v. Blitman, 462 F.2d 603, 604 (5th Cir. 1972) (no personal jurisdiction in a cause of action for breach of an oral contract for the fabrication and delivery of steel to a Georgia factory). Rather, the NDA formed the basis for an extended relationship between the parties–a relationship that was further memorialized through an

extension of the NDA executed in 2010.  The Court finds that the jurisdictional provision in the NDA is sufficient to confer specific jurisdiction over M&G for all claims arising out of the NDA.

Of course, being a party to a forum selection agreement is not a precondition to being bound by one, and other Chemtex and/or Andritz entities may also be bound by the forum selection clause in the NDA.  See Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1299 (11th Cir. 1998) (quoting Manetti-Farrow Inc. v. Gucci Am., Inc., 858 F.2d 509, 514 n.5 (9th Cir. 1988) ("[A] range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.").  The inquiry in the Eleventh Circuit is whether the litigant in question is " 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound" by the contractual selection of a litigation forum.  Id. (quoting Hugel v. Corp. of Lloyd's, 999 F.2d 206, 209 (7th Cir. 1993)).

All of the six other Defendants are directly or indirectly controlled by M&G Finanziaria. At the hearing on March 7, Defendants conceded that all but three Chemtex entities were bound by the NDA.  Defendants argued that

34

because three of the entities–specifically, Beta Renewables USA, Inc., Carolina Cellulosic Biofuels, LLC, and Beta Renewables SPA–did not exist at the time the NDA was executed, those Defendants cannot be bound by the NDA.  But, based on the law of the Eleventh Circuit, if it was "foreseeable" to those entities that they would be bound by the NDA at the time of those entities' formation, they, too, may properly be parties to this dispute.

The Court does not have sufficient information before it to conduct that inquiry at this juncture.  The Court notes that the parties may move for jurisdictional discovery, but that no formal request is currently pending. United Techs. Corp. v. Mazer, 556 F.3d 1260, 1280-81 (11th Cir. 2009) (affirming district court's dismissal where plaintiff never formally moved the district court for jurisdictional discovery but, instead, buried such requests in its briefs).

On this record, Plaintiff has sufficiently alleged that the NDA continued to be in effect throughout many of the events involved in this dispute, and that the obligations of the NDA were not in conflict with the obligations imposed by the other subsequent contracts.  Indeed, as Plaintiff points out in its Motion

35

to Supplement the Record, "Defendants can arbitrate their disputes (to the extent they have any) with Andritz AG, and litigate in Italy with the German entities to which it contracted should disputes between them arise, but they consented to litigation in Georgia for their disputes with Georgia-based Andritz Inc." (Dkt. [33] at 5.) The Court recognizes the public policy that counsels against piecemeal litigation. But based on the facts presently before it, the Court may exercise jurisdiction over these claims brought against M&G and its controlled entities.

In sum, Plaintiff has alleged sufficient facts and has narrowly tailored its Complaint to bring only claims that arise out of the NDA and has alleged specific facts to support those claims. Accordingly, Defendants' motion to dismiss for lack of personal jurisdiction is **DENIED**.

## VII.   Failure to State a Claim – Rule 12(b)(6)

Defendants also move to dismiss parts of the Complaint for failure to state a claim upon which relief may be granted. Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading

36

standard does not require "detailed factual allegations," "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action will

not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 555 (2007)).  In order to withstand a motion to

dismiss, "a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly,

550 U.S. at 570).  A complaint is plausible on its face when the plaintiff pleads

factual content necessary for the court to draw the reasonable inference that the

defendant is liable for the conduct alleged.  Id.

At the motion to dismiss stage, "all-well pleaded facts are accepted as

true, and the reasonable inferences therefrom are construed in the light most

favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273

n.1 (11th Cir. 1999).  However, the same does not apply to legal conclusions

set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260

(11th Cir. 2009) (citing Iqbal, 556 U.S. at 678).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not

suffice." Iqbal, 556 U.S. at 678.  Furthermore, the court does not "accept as

true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at

555.

Defendants move to dismiss several of Plaintiff's claims pursuant to Rule 12(b)(6).  First, Defendants argue that Plaintiff's claims for trade secret misappropriation (Count II) fails as a matter of law because Plaintiff failed to identify any alleged trade secret.  Defendant also argues that the unjust enrichment claim (Count III) must fail as a matter of law because it is barred by the existence of a valid contract governing the same subject matter.  Next, Defendants claim that Plaintiff failed to plead fraud (Count IV) with the particularity required by Rule 9(b).  Defendants argue that Plaintiff's North Carolina Deceptive Trade Practices claim (Count VI) fails as a matter of law because Plaintiff did not plead "aggravating circumstances."  Finally, Defendants move to dismiss Plaintiff's California Business and Professions Code claim (Count VII) on grounds that it fails as a matter of law because Plaintiff has not pleaded reliance or injury, and that these claims are duplicative of Plaintiff's breach of contract claim.

With respect to Counts II, IV, VI, and VII, the Court finds that Plaintiff has alleged sufficient particular facts such that its claims survive this Motion to

38

Dismiss.  Additionally, Defendant's motion to dismiss Count III is denied, because Plaintiff is permitted to allege a claim in the alternative.  The Court may dismiss this Count at a later date: for example, if Defendants do not dispute the validity of the NDA in their Answer.  But at this stage of the litigation, Defendants' Motion to Dismiss for failure to state a claim is **DENIED**.

### Conclusion

In accordance with the foregoing, Plaintiff Andritz Inc.'s Motion to Supplement the Record in Opposition to Defendants' Motion to Dismiss [33] is **GRANTED**.  Defendants's Motion to Dismiss [11] is **DENIED**.

Defendants are **DIRECTED** to file an answer within 21 (twenty-one) days of entry of this Order.

**SO ORDERED**, this 22nd day of March, 2016.

_____

**RICHARD W. STORY**
United States District Judge

39